*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 59**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH RESOURCES INTERNATIONAL, INC.,
a Utah Corporation,
*Petitioner, Appellant, and Cross-Appellee,*

*v.*

MARK TECHNOLOGIES CORPORATION and
KENNETH G. HANSEN,
*Respondent, Appellees, and Cross-Appellants.*

No. 20120427
December 23, 2014

Third District, Salt Lake
The Honorable Vernice S. Trease
No. 040918982

Attorneys:

John H. Bogart, Salt Lake City, Craig M. White, Chicago, IL,
for appellant

Bruce J. Boehm, Salt Lake City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    This case arises out of a decision by two minority
shareholders of Utah Resources International, Inc. (URI) to dissent
from the company's consummation of a share-consolidation
transaction. Utah law provides that shareholders may dissent from
certain corporate transactions and requires the corporation to pay
the dissenting shareholders "fair value" for their shares.[1] But here

---

[1] UTAH CODE § 16-10a-1302(1).

URI and the dissenters disagreed on the "fair value" of the dissenters' shares, which led to URI instituting a fair value proceeding in the district court. That court ultimately concluded that the fair value of the dissenters' shares was over two times the amount proposed by URI.

¶2 Before reaching the merits of this case, we first address whether URI waived its right to appeal given that it partially paid the judgment against it. We ultimately conclude that URI has not waived its right to appeal. URI has not satisfied the judgment against it in full and, regardless, it expressly reserved its right to appeal.

¶3 Turning to the merits, the primary question presented by URI is whether the district court erred in determining the fair value of the dissenters' shares. We conclude that the court did err in disallowing four deductions from URI's assets, namely, deductions for: (1) transaction costs associated with the anticipated sale of real estate, (2) trapped-in capital gains taxes related to the sale of real estate, (3) income taxes on oil and gas royalty interests, and (4) a discount on URI's minority interest in another company. In rejecting these deductions, the district court relied on inapplicable caselaw from other jurisdictions and misread our own caselaw. Accordingly, we vacate the district court's ruling and remand for proceedings consistent with this opinion. Because we vacate the district court's ruling on this basis, we do not address URI's additional claim that the court did not give adequate consideration to URI's market value or investment value. We also do not address the claims made by the dissenters in their cross appeal.[2]

**Background**

I. Before the 2004 Share-Consolidation Transaction

¶4 URI incorporated in Utah in 1966. The company engaged in a variety of business activities during the next four decades, including hotel operations, securities trading, and land development. But by early 2000, URI faced difficult economic

---

[2] Although we decline to reach the claims raised in the cross appeal, we briefly note them here. The dissenters argue that the district court erred by: (1) including URI's treasury shares in the number of outstanding shares, (2) failing to consider several alleged breaches of fiduciary duties in determining fair value, (3) improperly valuing the oil and gas royalty interests held by URI by not verifying the revenue projections with actual results, and (4) refusing to award them attorney fees.

circumstances and lacked sufficient liquidity to develop its land holdings. URI alleges that "constant litigation" by two activist shareholders, Mark Technologies Corp. (MTC) and Kenneth Hansen,[3] contributed to the company's struggles.[4] Because of these circumstances, URI's management decided to wind down the company by selling its land holdings. From that point on, the company's primary business consisted of holding and selling undeveloped real estate. The company also collected royalty revenue from oil and gas mineral leases.

¶5 According to URI, most of its shareholders wanted to sell their stake in the company before it completed the winding-down process. From 2000 to 2004, several dozen shareholders sold their shares to URI's president, John Fife, at prices ranging from $1,000 to $4,000 per share. By 2004, URI had approximately thirty-five shareholders. Inter-Mountain Capital Corporation (IMCC) was the largest shareholder and held about eighty-seven percent of URI's outstanding shares.[5]

## II. The 2004 Transaction

¶6 In late 2003, URI's board of directors wanted to provide the remaining shareholders added liquidity, so it investigated the possibility of conducting a share-consolidation transaction. The potential transaction consisted of two main steps. First, URI would effect a reverse-stock split through an amendment to its Articles of Incorporation. The company planned to reduce the number of outstanding shares on a 500 to 1 ratio. Each 500 shares of $100 par value stock would be converted into one share of $50,000 par value stock. Second, URI would buy out any fractional shareholders. The

---

[3] Throughout this opinion we refer to MTC and Mr. Hansen collectively as "the Dissenters." But we also refer to them individually as needed.

[4] URI notes that MTC and its owner, Mark Jones, filed six lawsuits against URI beginning in 1996. Among these suits was an attempt to block a sale of URI stock. In 1996, Mr. Jones attempted to obtain control of URI by buying shares held by the company's founder, John Morgan. Mr. Jones offered $3.00 per share. But he was outbid by John Fife, URI's president, who offered $3.35 per share. Mr. Jones tried to block the sale to Mr. Fife, but the case ultimately settled and the sale proceeded.

[5] Mr. Fife was the president and sole shareholder of IMCC.

transaction would have the effect of buying out all of URI's shareholders except for Mr. Fife and his company, IMCC.

¶7 URI's board hired Jeff Wright of Centerpoint Advisors, Inc. to appraise the company and determine the fair value of its shares. Mr. Wright had performed a similar valuation for URI on previous occasions.[6] He issued a fairness opinion, which offered URI's board several possible values for the company's shares, including a market value of $2,750 per share, an investment value of $4,908 per share, and a net asset value of $5,644 per share.[7]

¶8 URI's board unanimously voted in favor of the share-consolidation transaction on March 26, 2004, and its shareholders approved the transaction just over two months later. The company made the transaction effective on June 15, 2004.[8] Based on Mr. Wright's fairness opinion, URI decided to repurchase fractional shares for $5,250 per share held before the reverse-stock split. Accordingly, URI tendered payment of $656,250 to MTC for its 125 shares, plus $5,214.04 in interest, and tendered payment of $162,750 to Mr. Hansen for his 31 shares, plus $2,184.86 in interest.

¶9 MTC and Mr. Hansen were the only shareholders to object to the share-consolidation transaction. They valued their shares in URI at $31,847 per share. They complained that the share consolidation was the culmination of several attempts by Mr. Fife to gain an "unpaid for majority position in URI" and "squeeze out"

---

[6] In 1999, URI engaged in a similar share-consolidation transaction. In that transaction, URI effected a 1,000 to 1 reverse-stock split and bought out fractional shareholders. URI paid the fractional shareholders $3.35 per share held prior to the reverse-stock split. This reduced the number of URI shareholders from approximately 500 to about 70.

[7] Mr. Wright's opinion relied, in part, on an appraisal of URI's real estate performed by Porter & Associates (Porter). As we explain below, the district court did not adopt Porter's appraisal but instead adopted one performed by Fortis Group (Fortis) because it concluded the Fortis appraisal was more accurate. URI does not challenge the court's finding of fact on this point and therefore we omit further discussion of the Porter appraisal.

[8] We refer to this date as the "valuation date" because section 16-10a-1301(4) of the Utah Code defines the "fair value" of a dissenter's shares as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects."

minority shareholders by purchasing their stock at undervalued prices. Ultimately, URI and the Dissenters were unable to reach an agreement regarding the value of the Dissenters' shares. Accordingly, URI timely petitioned the district court to determine the "fair value" of the shares.[9]

### III. Fair Value Proceedings in the District Court

¶10 As noted above, on the valuation date, URI's primary business strategy was to hold real estate assets for sale. URI's vice president, Gerry Brown, testified that "everything [was] for sale." He estimated that it would take approximately ten years to sell all of the company's property. This business strategy was not contingent on the consummation of the share-consolidation transaction.

¶11 URI points out that because of its business strategy "[t]here is accordingly no dispute that the vast majority of URI's value as of the valuation date, and its only realistic means of generating earnings, came from its assets." URI's assets, as of the valuation date, can be divided into four general categories. First, URI held seventeen parcels (about 345 total acres) of undeveloped real estate in St. George, Utah. Second, it held a minority-membership interest in Hidden Hollows Associates, LLC (HHA), which is a closely held real estate company headquartered in Park City, Utah. Third, it owned oil and gas royalty rights. And fourth, it owned a variety of other miscellaneous assets, including cash and receivables.

¶12 One of URI's largest liabilities was trapped-in capital gains taxes on the St. George real estate. A trapped-in capital gains tax liability accounts for the fact that a company will incur a capital gains tax if it sells an appreciated asset.[10]

---

[9] *See* UTAH CODE § 16-10a-1330(1) ("If a demand for payment . . . remains unresolved, the corporation shall commence a proceeding within 60 days after receiving the payment demand . . . and petition the court to determine the fair value of the shares and the amount of interest.").

[10] SHANNON P. PRATT, BUSINESS VALUATION DISCOUNTS AND PREMIUMS 276 (2d ed. 2009) ("The concept of trapped-in capital gains is that a company holding an appreciated asset would have to pay a capital gains tax on the sale of the asset. If ownership of the company were to change, the liability for the tax on the sale of the appreciated asset would not disappear.").

¶13  The district court received three appraisals of URI—two from the court-appointed appraiser, Roger Smith, and one from URI's testifying expert, Francis Burns. The core issues before us on appeal relate to these appraisals, and consequently we separately describe each appraisal in some detail below.

## A.  Mr. Smith's Appraisals

¶14 Mr. Smith's initial appraisal estimated the value of the Dissenters' shares using an asset-value approach.[11] That approach required him to separately appraise the value of each of URI's assets. In determining the value of URI's assets, Mr. Smith discounted the value of URI's interest in HHA, based on URI's status as a minority shareholder and the projected transaction costs in selling that interest.[12] He then deducted from the discounted asset value both booked and projected liabilities. These included deductions for (1) anticipated trapped-in capital gains taxes and transaction costs related to the sale of the St. George real estate,[13] and (2) income taxes

---

[11] We note that each of Mr. Smith's appraisals state that he considered both the income value approach and market value approach, in addition to an asset value approach. But Mr. Smith apparently calculated neither an income value nor market value for URI as a whole. Rather, he used an income approach only to value URI's oil and gas royalty interests. Moreover, he noted that "the Market Approach was not used [by him] in estimating the value of URI as a whole," but that a market approach was used by Fortis in valuing URI's real estate.

[12] Mr. Smith used the Fortis real estate appraisal to value HHA's land holdings, which he used to compute the value of HHA as a company. He then calculated the asset value of URI's interest in HHA. URI owned, on the valuation date, 49.58 percent of HHA. Because URI held only a minority stake in HHA and because there would be transaction costs in selling that interest, Mr. Smith applied a fifteen percent discount to URI's interest. This reduced the value of URI's interest in HHA by $150,000.

[13] Mr. Smith first reduced the gross value of the St. George real estate by 5.5 percent for transaction costs associated with selling the land, including anticipated broker commissions and closing costs. He then reduced the adjusted value by 37.3 percent of the difference between it and the land's book value (the difference being the net appreciation of the property). In sum, these calculations reduced URI's net asset value by $5,818,500.

on URI's oil and gas royalty interests.[14] In the end, Mr. Smith derived an asset value for URI of $17,769,073, or $7,571 per share.[15]

¶15 Both parties contested Mr. Smith's initial valuation. URI objected to it as being "incomplete, insofar as it did not offer an Investment Value or Market Value for URI." The district court overruled URI's objections. The Dissenters challenged, as a matter of law, Mr. Smith's use of certain asset discounts and projected liabilities deductions. Specifically, they challenged Mr. Smith's application of a discount to URI's interest in HHA on the basis that any marketability discount was contrary to Utah law. And they challenged Mr. Smith's use of tax and transaction costs deductions on the basis that any future land sales, and the accompanying taxes and costs, were "speculative" and that Utah law prohibited the district court from considering them. The district court sustained the Dissenters' objections and ordered Mr. Smith to produce a new appraisal without any marketability discounts or adjustments for built-in capital gains taxes. The district court's disallowance of these discounts and deductions is the first issue URI has raised on appeal.

¶16 Mr. Smith stated that he believed his initial appraisal represented the fair value of URI, but he agreed to amend his report, indicating that he and his fellow appraisers were "not attorneys and [were] not qualified to interpret Utah law." His amended valuation resulted in the following differences:

---

[14] Mr. Smith employed an income capitalization method to appraise the oil and gas royalty interests. His valuation describes this approach as "'a method within the income approach whereby economic benefits for a representative single period are converted to value through division by a capitalization rate.'" This approach accounts for the costs necessary to generate income, including income taxes. Ultimately, accounting for income taxes reduced the capitalized value of the oil and gas royalties by $1,428,000.

[15] Mr. Smith's asset approach valuation was nearly $2,000 per share more than Mr. Wright's 2004 valuation. This difference is largely attributable to the fact that Mr. Smith used the Fortis real estate appraisal rather than the Porter real estate appraisal used by Mr. Wright. As noted above, *supra* ¶ 7 n.7, the district court chose to rely on the Fortis appraisal and URI does not challenge that finding of fact.

| Asset | Initial Valuation | Amended Valuation | Difference |
|---|---|---|---|
| St. George Real Estate | $9,835,000 | $15,653,500 | $5,818,500 |
| Mineral Royalties | $2,400,000 | $3,828,000 | $1,428,000 |
| HHA | $1,351,000 | $1,501,000 | $150,000 |
| Other Net Assets | $4,183,073 | $4,183,073 | - |
| **Total** | $17,769,073 | $25,165,573 | $7,396,500 |
| **Total per Share** | $7,571 | $10,722 | $3,151 |

¶17 Mr. Smith later repudiated his own amended valuation. He stated that the amended valuation conflicted with generally accepted appraisal techniques and was "not consistent with how [he] normally value[s] businesses." He testified that he had never valued an asset without considering both the costs of selling the asset and associated taxes. He also noted that as to the oil and gas royalty interests specifically, the amended values were mathematically and factually erroneous, but were calculated to satisfy the district court's requirements. Moreover, Mr. Smith stated that he thought his first appraisal accurately valued URI's assets and that it was his view that no rational buyer would have paid more than $25,000,000 for URI on the valuation date. Despite Mr. Smith's protestations, the district court adopted his amended valuation in full.

### B. Mr. Burns's Appraisal

¶18 The district court overruled URI's objections to Mr. Smith's initial valuation, but did so without prejudice and permitted URI to offer its own expert testimony. Consequently, URI retained Francis Burns to perform a fair value appraisal. Mr. Burns agreed with Mr. Smith that Mr. Smith's amended valuation did not accurately reflect URI's fair value. He also largely agreed with the asset value Mr. Smith derived in his first valuation. He concluded it was appropriate to consider tax adjustments and transaction costs in deriving net asset value because URI planned to sell its real estate assets and any hypothetical investor would similarly discount URI's value.

¶19 Mr. Burns calculated two different values for URI's shares — market value and adjusted net asset value. He concluded that the market value of URI was $11,127,127. He derived this number by looking first to prior transactions involving URI's stock. He found that the most recent transaction involved stock sold by Mr. Fife to a company controlled by Mr. Morgan for $2,750. Mr. Burns concluded that "it is clear the $2,750 per share price was an established market price between parties negotiating at arm's length." But Mr. Burns

also concluded that "this price would need to be adjusted to remove the impact of discounts for lack of control and lack of marketability." Based on data of transactions of real estate limited partnership interests, Mr. Burns concluded that the prior transaction price of $2,750 represented a forty-two percent discount for lack of control and lack of marketability. Accordingly, he concluded that the adjusted fair market value was $4,741 per share. Mr. Burns also noted that he attempted to identify guideline companies comparable to URI by searching Bloomberg, but he concluded that "there were no public companies that fit URI's profile sufficiently enough to be used as guideline comparisons."

¶20 In addition to market value, Mr. Burns provided an "adjusted net asset value" for URI's shares. He explained that he could not provide a traditional income value for URI's shares "because URI's historical earnings did not reflect the earnings it could expect in the future from selling its large portfolio of real estate." So he calculated adjusted net asset value instead. He explained that this value blends "the income and asset methods − with appraised property on the balance sheet capturing future revenues and liabilities capturing future operating expenses and taxes."[16] He then concluded that URI's adjusted net asset value was $15,700,365. The following table summarizes Mr. Burns's calculations:

---

[16] Mr. Smith testified that Mr. Burns's approach of projecting asset sales and discounting the result to present value was "certainly one way to do it."

| Asset | Asset Value | After Control & Marketability Adjustments | After Built-In Capital Gains (Losses) Tax Adjustments | After Operating Expenses & Booked Liabilities Adjustments |
|---|---|---|---|---|
| Real Estate | $15,653,500 | $14,792,558[17] | $12,165,974[18] | $15,700,365[19] |
| HHA Interest | $1,501,000 | $1,170,780[20] | | |
| Royalty Interests | $2,456,000[21] | $2,456,000 | $2,456,000 | |
| Other Assets | $4,552,346 | $4,552,346 | $4,552,346 | |
| **Total** | $24,162,846 | $22,971,684 | $19,174,320 | $15,700,365 |
| **Total per Share** | $10,295 | $9,788 | $8,170 | $6,690 |

---

[17] Mr. Burns reduced the value of the real estate by 5.5 percent to account for broker commissions and closing fees that would be incurred in selling the property. Mr. Wright applied the same deduction in his initial valuation.

[18] Mr. Burns adjusted the value of URI's real estate and interest in HHA for the projected capital gains and losses that would result by liquidating each of those assets. He estimated a capital gain of $13,291,947 for the real estate and a capital loss of $305,352 for the HHA interest. He then discounted the projected capital gain based on management's projection that it would take ten years to liquidate the real estate. Ultimately, accounting for built-in capital gains and losses reduced the combined value of the two assets by $3,797,364.

[19] Mr. Burns reduced the value of URI's assets by $3,104,682 to account for ongoing operating expenses. He noted that this was appropriate because URI would "continue to incur operating expenses as it managed and liquidated its [assets]." He also reduced asset value by $369,273 to account for estimated booked liabilities.

[20] Mr. Burns reduced the value of URI's minority interest in HHA by twenty-two percent to account for a lack of control and lack of marketability. Mr. Smith likewise discounted URI's interest in HHA, but by only fifteen percent.

[21] Mr. Burns agreed with Mr. Smith that the income capitalization approach was an appropriate way to value the royalty interests. But he adjusted the value derived by Mr. Smith upwards by $56,000 because, according to him, the royalty income figures provided to Mr. Smith by URI were already net of production expenses. In effect, he believed Mr. Smith double counted the expenses.

¶21 Mr. Burns assigned relative weights of sixty percent and forty percent to adjusted net asset value and market value, respectively. This resulted in his ultimate conclusion that the fair value of URI's shares was $5,910 per share.

¶22 In sum, the district court had a variety of appraisals of URI's fair value before it. The table below summarizes those valuations:

| Valuation | Asset Value per Share | Investment Value per Share | Market Value per Share | Fair Value per Share |
|---|---|---|---|---|
| Mr. Wright | $5,644 | $4,908 | $2,750 | $5,250[22] |
| Mr. Smith | $7,571 | None offered | None offered | $7,571 |
| Mr. Smith (Amended)[23] | $10,722 | None offered | None offered | $10,722 |
| Mr. Burns | $6,690 | None offered[24] | $4,741 | $5,910[25] |

¶23 The district court ultimately accepted only Mr. Smith's amended valuation, holding that any adjustment for marketability or taxes was improper as a matter of law. Accordingly, the court entered judgment against URI for the difference of Mr. Smith's amended valuation share price and what URI paid the Dissenters in 2004 ($10,722 – $5,250 = $5,472 per share difference), plus interest. URI paid part of the judgments in the amounts of $750,000 to MTC and $185,000 to Mr. Hansen. In the letter delivering the payment, URI stated that it did not intend to waive its current appeal and that

---

[22] This value was proposed by URI and confirmed by Mr. Wright as a fair value.

[23] As explained above, Mr. Smith used the income and market approaches in valuing certain assets held by URI. *Supra* ¶ 14 n.11. But he did not provide separate income and market values for URI as a whole.

[24] As noted above, Mr. Burns concluded that he could not value URI using a traditional income approach because he could not accurately estimate future cash flows. But he noted that the "Adjusted Net Asset Value" he derived for URI was a "blending of the income and asset methods" because it captured future revenues and future expenses.

[25] Mr. Burns's valuation relied on the appraisal done by the Fortis Group. He also provided a fair value of $5,333 based on Porter's appraisal.

it was paying only to abate interest and reduce the threat of postjudgment enforcement proceedings. The Dissenters accepted the payments and filed partial satisfactions of judgment. URI now appeals the district court's determination of the fair value of its shares. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## Standard of Review

¶24 URI asks us to determine whether the district court properly determined the fair value of the Dissenters' shares in URI. "[W]hile the ultimate determination of fair value is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value under [Utah law] is a question of law which we review *de novo*."[26]

## Analysis

¶25 Before addressing the merits of this case, we consider whether URI waived its right to appeal by voluntarily making a partial payment of the judgment and conclude that URI did not waive its right to appeal. URI has not fully satisfied the judgment and, moreover, URI has expressly reserved its right to appeal throughout the proceedings.

¶26 After concluding that URI's appeal is not moot, we turn to the merits of the case. URI challenges the district court's fair value determination in two respects. First, it argues that the court erred in rejecting deductions for (1) transaction costs associated with the anticipated sale of URI's St. George real estate, (2) trapped-in capital gains taxes related to the sale of the St. George real estate, (3) taxes on URI's oil and gas royalty interests, and (4) URI's minority interest in HHA. Second, it argues that the district court erred by failing to give adequate consideration to URI's investment value and market value.

¶27 We agree with URI that the district court erroneously refused to consider the four challenged deductions. In rejecting use of the deductions, the court relied on inapplicable caselaw from other jurisdictions and misapplied our own caselaw. Further, it rejected several of the deductions on the basis that they were speculative, even though use of the deductions is an accepted technique by financial professionals. Because of these errors, we vacate the district court's fair value determination and remand the

---

[26] *Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 10, 63 P.3d 80 (first alteration in original) (internal quotation marks omitted).

case to the district court for proceedings consistent with this opinion. And because we vacate the court's ruling on this basis, we decline to reach URI's second claim on appeal and the claims made by the Dissenters in their cross appeal.

I. Judgment Debtors Waive Their Right to Appeal by Voluntarily Paying a Judgment Without Manifesting Their Intent to Appeal

¶28 In the companion case to this appeal, the parties argued at length over the question whether a judgment debtor waives its right to appeal by satisfying the judgment.[27] URI has not satisfied the judgment, so there is no plausible argument in *this case* that URI has waived its right to appeal. That said, both URI and the Dissenters were validly concerned that they may waive their right to appeal by either satisfying the judgment or acquiescing in the judgment, respectively. And given the considerable confusion in our caselaw and in the district court below over this important question, we take the opportunity now to clarify the state of the law.

¶29 The general rule in our state is that "if a judgment is voluntarily paid, which is accepted, and a judgment satisfied, the controversy has become moot and the right to appeal is waived."[28] This rule affects both parties—if a judgment debtor "voluntarily pa[ys]" the judgment, he may waive his right to appeal.[29] Similarly, a judgment creditor "who accepts a benefit under a judgment is estopped from later attacking the judgment on appeal."[30] But both parties waive their rights only with respect to the claims for which the judgment was paid or accepted.[31]

---

[27] *Utah Res. Int'l, Inc. v. Mark Techs. Corp.*, 2014 UT 60.

[28] *Jensen v. Eddy*, 514 P.2d 1142, 1143 (Utah 1973).

[29] *Id.*

[30] *Trees v. Lewis*, 738 P.2d 612, 613 (Utah 1987). Multiple rationales support this rule, as we enunciated in *Richards v. Brown*, 2012 UT 14, ¶¶ 13–20, 274 P.3d 911. One reason for this rule is that in accepting the benefit, the judgment creditor manifests his or her interest in finality and desire to accept the terms of the judgment. *Id.* ¶ 13. Also, a judgment creditor who accepts the benefits of a judgment shifts the burden of risk to the judgment debtor, because the risk of recovery now falls on the judgment debtor if the judgment is overturned on appeal. *Trees*, 738 P.2d at 613.

[31] *See Richards*, 2012 UT 14, ¶ 16 ("The right to appeal is waived only for the specific claims upon which payment is accepted.");

(continued)

¶30  In this case, we are asked to clarify the scope of the rule as it pertains to judgment debtors. The question is of central importance to the case, since URI has been presented with a dilemma—either satisfy the judgment and risk waiving its right to appeal, or withhold payment of the judgment but face the mounting interest from the onerous statutory rate. As we clarify below, judgment debtors may avoid this dilemma by satisfying the judgment but expressly reserving their right to appeal.

¶31  Again, the general rule is that "if a judgment is voluntarily paid, which is accepted, and a judgment satisfied, the controversy has become moot and the right to appeal is waived."[32] We have reaffirmed the validity of this general rule on several occasions on the basis that "[p]ayment and its acceptance manifest the parties' expression of finality and resolution of all issues embraced by the particular claim."[33] In *Ottenheimer v. Mountain States Supply Co.*,[34] we confirmed this to be the rule even where a judgment debtor wishes to pay the judgment while still reserving his right to appeal. In that case, the lower court ruled against a landowner, ordering him to vacate the property and pay money due under the lease at issue.[35] The landowner appealed and vacated the premises but noted that by vacating the premises he was not "waiving any of [his] claims against [any of the] plaintiffs."[36] Despite the landowner's expression of his clear intent to appeal, we ruled that he had waived his right to appeal.[37]

¶32 We muddied the waters in *Golden Spike Equipment Co. v. Croshaw*,[38] however, when we concluded that

---

*Ottenheimer v. Mountain States Supply Co.*, 188 P. 1117, 1118–19 (Utah 1920) (finding that the judgment debtor's act of surrendering property waived the judgment debtor's right to appeal the issue).

[32] *Jensen*, 514 P.2d at 1143.

[33]  *Richards*, 2012 UT 14, ¶ 13; *see also Gardner v. Bd. of Cnty. Comm'rs*, 2008 UT 6, ¶ 46, 178 P.3d 893; *Sullivan v. Utah Bd. of Oil, Gas & Mining*, 2008 UT 44, ¶ 12, 189 P.3d 63.

[34] 188 P. at 1118–19.

[35] *Id*.

[36] *Id*. at 1118 (internal quotation marks omitted).

[37] *Id*. at 1118–19.

[38] 401 P.2d 949 (Utah 1965).

> whether the payment of a judgment precludes the taking of an appeal would depend on the circumstances. We do not disagree with the proposition that if the payment is made under circumstances which show that the party intends to be bound by the judgment, an appeal should not be allowed. On the other hand, *conditions may be such* as to justify the payment of a judgment *with the intention of preserving the right to appeal*. When this is made to appear, the right to appeal should not be denied.[39]

We thus recognized that mere payment of a judgment does not necessarily demonstrate *acquiescence* in the judgment. And where the judgment debtor's intention of preserving his right to appeal "is made to appear, the right to appeal should not be denied," since there is no acquiescence in that circumstance.[40]

¶33 Given the confusion that our caselaw in this field has created, we clarify today that although the general rule that voluntary payment of a judgment waives one's right to appeal is still valid, where a judgment debtor's intention of preserving his right to appeal "is made to appear" clearly on the record, he does not waive his right to appeal.[41] To the extent that our prior caselaw holds or implies otherwise, we disavow such statements. Furthermore, it is clear in this case that URI's appeal is *not* moot: the judgment has never been fully satisfied and URI has, from the time the final judgment was entered, clearly indicated its intent to appeal from the fair value assessment.

## II. We Vacate the District Court's Fair Value Ruling Because It Erred in Concluding That the Challenged Discounts and Deductions Were Impermissible

### A. Utah's Dissenters' Rights Statute

¶34 Before addressing each of the specific discounts and deductions at issue in this case, we briefly describe the dissenters' rights statute to give context. Utah's dissenters' rights statute provides a mechanism through which minority shareholders can dissent from certain corporate actions and force the corporation "to provide [the] dissenting minority with the fair value of the shares

---

[39] *Id.* at 951 (emphases added) (footnotes omitted).

[40] *Id.*

[41] *Croshaw*, 401 P.2d at 951.

that they possess."[42] A shareholder's right to dissent is triggered by a narrow class of corporate actions,[43] none of which are applicable here. But the statute also allows a shareholder to dissent "in the event of any other corporate action to the extent . . . a resolution of the board of directors so provides."[44] Such a resolution gave rise to the Dissenters' right to dissent here. URI's Board of Directors passed a resolution making dissenters' rights available upon consummation of the share-consolidation transaction.

¶35 After a shareholder provides the corporation with notice that the shareholder intends to dissent and demands payment, the corporation is obligated to "pay the amount the corporation estimates to be the fair value of the dissenter's shares, plus interest to each dissenter."[45] A shareholder may contest the corporation's fair value determination by "notify[ing] the corporation in writing of his own estimate of the fair value of his shares and demand payment of the estimated amount."[46] The corporation then has the choice to either pay the shareholder the amount demanded or, instead, to "commence a proceeding within 60 days after receiving the payment demand . . . and petition the court to determine the fair value of the shares and the amount of interest."[47] If the corporation chooses to commence proceedings in court, the court may appoint appraisers to "recommend decision on the question of fair value."[48] The court's fair value determination is binding on the parties and "[e]ach dissenter . . . is entitled to judgment . . . for the amount, if any, by which the court finds that the fair value of his shares, plus interest, exceeds the amount paid by the corporation."[49]

---

[42] *Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 13, 63 P.3d 80.

[43] UTAH CODE § 16-10a-1302(1) (including consummation of: (1) "a plan of merger," (2) "a plan of share exchange," (3) "a sale, lease, exchange, or other disposition of all, or substantially all, of the property of the corporation," and (4) "a sale, lease, exchange, or other disposition of all, or substantially all, of the property of an entity controlled by the corporation").

[44] *Id.* § 16-10a-1302(2).

[45] *Id.* § 16-10a-1325(1).

[46] *Id.* § 16-10a-1328(1)

[47] *Id.* § 16-10a-1330(1).

[48] *Id.* § 16-10a-1330(4).

[49] *Id.* § 16-10a-1330(5)(a).

¶36 There are few specific rules that guide a district court's "fair value" determination. The dissenters' rights statute defines "fair value" as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action."[50] In short, the statute requires that "any effect of the [triggering event] must be excluded" in determining fair value.[51]

¶37 Two of our cases address what constitutes "fair value." First, in *Oakridge Energy, Inc. v. Clifton*, we adopted what is commonly referred to as the Delaware Block Method.[52] Under that approach, "the three most recognized and relevant elements of fair value for stock valuation purposes are asset value, market value, and investment value."[53] We noted that while "[a]ll three components of fair value may not influence the result in every valuation proceeding . . . all three should be considered."[54]

¶38 We next addressed the issue of fair value in *Hogle v. Zinetics Medical, Inc.*[55] In that case, we prohibited the use of shareholder-level minority or marketability discounts.[56] We also clarified that "fair value" of a dissenters' shares is the dissenters' "proportionate share of the value of 100% of the [corporation's] equity."[57]

---

[50] *Id.* § 16-10a-1301(4).

[51] *Oakridge Energy, Inc. v. Clifton*, 937 P.2d 130, 134 (Utah 1997).

[52] *Id.* at 132; R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 9.45[B] (3d ed. 2013).

[53] *Hogle*, 2002 UT 121, ¶ 18.

[54] *Oakridge Energy, Inc.*, 937 P.2d at 135 (first alteration in original) (internal quotation marks omitted); *see also Hogle*, 2002 UT 121, ¶¶ 22, 31 (concluding that the district court was not required to consider asset value "where the parties had adduced none" and approving of the court's decision to "substantially disregard[] [market value]" where the court concluded the appraisers' approach was unreliable (internal quotation marks omitted)).

[55] 2002 UT 121.

[56] *Id.* ¶¶ 45–46.

[57] *Id.* ¶ 45 (internal quotation marks omitted).

¶39 In sum, under the dissenters' rights statute and our caselaw, "fair value" is determined by (1) assessing the dissenters' proportionate share of the value of one-hundred percent of the corporation's equity; (2) considering the asset, market, and investment value approaches, to the extent that those approaches have been presented by the parties and are reasonably reliable under the circumstances; (3) without using shareholder-level minority or marketability discounts; and (4) without including any effect of the triggering event. Apart from these elements, courts have widely held that "'all generally accepted techniques of valuation used in the financial community'" are appropriate in determining fair value.[58] With this background in place, we turn now to the claims raised in this appeal.

### B. The District Court Erred in Rejecting as a Matter of Law a Discount for Transaction Costs and a Deduction for Trapped-In Capital Gains

1. Discount for Transaction Costs

¶40 In his initial valuation, Mr. Smith reduced the gross value of URI's St. George real estate by 5.5 percent for anticipated broker commissions and closing costs. The district court rejected this discount for two reasons. First, it concluded that it was an impermissible marketability discount under our decision in *Hogle*. And second, it concluded the discount was improper because it was "speculative." The district court erred in both respects.

---

[58] *Bingham Consolidation Co. v. Groesbeck*, 2004 UT App 434, ¶ 39, 105 P.3d 365 (quoting *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 556 (Del. 2000)); *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 712–13 (Del. 1983) (explaining that the Delaware Block Method does not "exclusively control" the determination of fair value but that courts should consider "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court"); F. Hodge O'Neal & Robert B. Thompson, 1 Oppression of Minority Shareholders and LLC Members § 5:32 (2014) (describing the *Weinberger* approach of utilizing "techniques or methods which are generally considered acceptable in the financial community" as the "modern method [that] has generally supplanted a more formalistic approach of an earlier time that focused on market value, asset value, and earnings value or some combination of those factors").

¶41 As to the court's first reason for rejecting the transaction costs discount, URI argues that the court misapplied *Hogle* because the marketability discount we disapproved of there was one that applied at the shareholder level, whereas here the discount was applied at the asset level. We agree.

¶42 Described generally, a shareholder-level discount "involve[s] varying 'fair value' based on the characteristics of the shares in the hands of particular shareholders."[59] By contrast, an asset-level discount reduces the value of a specific asset because of that asset's particular characteristics.[60] In *Hogle*, we followed the majority rule in holding that "discounts at the shareholder level are inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller."[61] We explained that

> [t]he American Law Institute explicitly confirms the
> interpretation of fair value as the proportionate share

---

[59] ROBERT A. RABBAT, *Application of Share-Price Discounts and Their Role in Dictating Corporate Behavior: Encouraging Elected Buy-Outs Through Discount Application*, 43 WILLAMETTE L. REV. 107, 141 (2007).

[60] The Dissenters argue that shareholder-level and asset-level discounts have identical effects and that distinguishing between the two "allow[s] an end-run around the prohibition against minority and marketability discounts." To support this argument, they cite a law review article that suggests that distinguishing shareholder-level discounts from corporate-level discounts is "tenuous at best." *Id.* But the Dissenters overlook the fact that the article discusses *corporate-level discounts* not *asset-level discounts*. Nowhere does the article suggest that it is improper to distinguish asset-level discounts from shareholder-level discounts. As the author notes, distinguishing corporate-level discounts from shareholder-level discounts is tenuous because "[a]t both levels, the discounts account for the same economic realities; the difference is only in the timing of application." *Id.* at 143. This concern is inapplicable when distinguishing asset-level discounts from shareholder-level discounts because the two do not account for the same economic realities. For instance, here the discount for transaction costs associated with selling URI's real estate has nothing to do with the fact that the Dissenters, because of their minority position, lacked the ability to control URI.

[61] 2002 UT 121, ¶ 45 (internal quotation marks omitted).

of the value of 100% of the equity, by entitling a
dissenting shareholder to a proportionate interest in
the corporation, without any discount for minority
status or, absent extraordinary circumstances, lack of
marketability.[62]

We did not address asset-level marketability discounts in our
decision. But the district court extended *Hogle* to asset-level
discounts, reasoning that the "decision did not carve out any
exceptions for asset-level discounts" and "*Hogle*'s prohibition . . .
would be largely meaningless if courts were to allow a company
engaging in a stock consolidation that results in forcing out its
minority shareholders to discount the value of those shares through
'asset' level discounts."

¶43  This was an unwarranted extension of our decision in *Hogle*.
The marketability discount we disapproved of in that case was one
that specifically affected the shares held by dissenting shareholders.
Because dissenting shareholders "are unwilling sellers with no
bargaining power," it would be unfair to penalize them for the lack
of marketability of their shares or their lack of control.[63]

¶44 But these concerns are not at issue where a company
discounts the value of an asset that it intends to sell for reasonable
transaction costs. URI's undisputed business strategy at the time of
the valuation date was holding and selling its real estate. All of the
appraisers recognized that it was reasonably foreseeable that URI
would incur expenses in selling the real estate. These expenses
include costs associated with marketing the property, broker
commissions, and closing costs. And as Mr. Smith noted in his initial
valuation, "we have calculated appropriate discounts to apply to
the[] [real estate assets] due to the fact that they would have an equal
impact on both [parties]." Because the transaction costs here would
have equally affected both the majority and minority shareholders,
the district court erred by equating these transaction costs with the
shareholder-level marketability discounts we prohibited in *Hogle*.

¶45 The district court's second rationale for rejecting the
discount for transaction costs is also flawed. The court rejected use of
the discount on the alternative basis that the costs were
"speculative." To reach this conclusion, the court relied on three

---

[62] *Id.* ¶ 45 (alteration in original) (internal quotation marks
omitted).

[63] *Id.* (internal quotation marks omitted).

cases from other jurisdictions.[64] These cases hold that in determining fair value it is improper for a court to consider costs incurred after the event triggering dissenters' rights. For instance, in *Hansen v. 75 Ranch Co.*, the Montana Supreme Court stated that "if costs are incurred after effectuation of the [triggering event], those costs should not be assessed against the dissenting shareholders."[65] But these cases are inapposite here because in each of the cases the company had no intent to sell its assets before the triggering event.[66] In contrast, URI's undisputed business strategy of selling its real estate assets had been in place for approximately four years before the consummation of the share-consolidation transaction. And Mr. Brown testified that the company planned to sell its real estate over the course of ten years. Given this business strategy, it was appropriate for the appraisers to consider reasonable transaction costs in valuing URI's real estate.

¶46 In sum, the transaction costs discount applied by Mr. Smith in his initial appraisal was not an impermissible marketability discount because it did not penalize the Dissenters for their lack of control of the company. Moreover, in concluding that the discount was "speculative," the district court applied inapplicable caselaw from other jurisdictions and overlooked the fact that URI's undisputed business strategy was to sell its real estate. Accordingly, we conclude that the court erred in rejecting the discount as a matter of law.

2. Trapped-In Capital Gains Deduction

---

[64] *See Hansen v. 75 Ranch Co.*, 957 P.2d 32 (Mont. 1998); *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.* (*Trapp Family*), 725 A.2d 927 (Vt. 1999); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673 (Wyo. 2006).

[65] 957 P.2d at 43.

[66] *See id.* ("[O]rdinarily when dissenting stock is accorded net asset value, that value is to be determined by considering the corporation as a going concern and not as if it is undergoing liquidation." (internal quotation marks omitted)); *Trapp Family*, 725 A.2d at 934 ("Here, there was no evidence that [the company] was undergoing liquidation on the valuation date. Indeed, the evidence indicated that [the company] was a going concern."); *Brown*, 141 P.3d at 689 ("The undisputed testimony indicated that there were no current plans to sell any of [the company's] land, unless such action was required to pay the judgment to [the dissenters].").

¶47 After reducing the value of the St. George real estate by 5.5 percent for transaction costs, Mr. Smith further reduced the real estate's value to account for trapped-in capital gains taxes. This calculation required reducing the adjusted value of the real estate by 37.3 percent[67] of the difference between the real estate's adjusted value and its book value (the difference being the net appreciation of the real estate).

¶48 The district court rejected this deduction and held that it was impermissible because the sale of the St. George real estate was not "imminent" as of the valuation date. As an additional basis for rejecting the deduction, the court held that it was "improper to deduct capital gains tax liability in determining the fair value of dissenters' shares where the dissenters have already or will pay capital gains taxes on the appreciation of their shares."

¶49 The district court erred in rejecting this deduction because it again relied on inapplicable cases from other jurisdictions and because, as each appraiser recognized, it is a generally accepted financial technique to consider reasonably foreseeable taxes.

¶50 The court rejected the deduction for trapped-in capital gains based on the same caselaw[68] it relied on in rejecting the discount for transaction costs, stating that the sale of the St. George real estate was not imminent, and thus discounts for future capital gains taxes would be too speculative. But each of those cases rejected use of a trapped-in capital gains deduction where the company had no plan to sell its assets prior to the triggering event.[69] In contrast, it is

---

[67] This percentage represents URI's estimated combined federal and state marginal tax rate.

[68] *See Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549 (Del. 2000); *Hansen*, 957 P.2d 32 (Mont. 1998); *Trapp Family*, 725 A.2d 927 (Vt. 1999); *Brown*, 141 P.3d 673 (Wyo. 2006).

[69] *Paskill*, 747 A.2d at 552 ("The record reflects that a sale of its appreciated investment assets was not part of [the company's] operative reality on the date of the merger."); *Hansen*, 957 P.2d at 38 (noting that the company "exchanged substantially all of the property of the Corporation other than in the ordinary course of business"); *Trapp Family*, 725 A.2d at 934 ("[T]he trial court correctly determined that no tax consequences of a sale of corporate assets should be considered where no such sale is contemplated."); *Brown*, 141 P.3d at 688 ("As of [the triggering event] date, no sale of assets was contemplated.").

undisputed here that URI's business plan *before* the share-consolidation transaction included selling all of its St. George real estate.

¶51 URI argues that most courts actually allow for consideration of trapped-in capital gains tax deductions where the taxes are incurred in the ordinary course of business and are unrelated to the triggering event. For instance, in *Matthew G. Norton Co. v. Smyth*, the Washington Court of Appeals rejected adopting a bright-line rule that would prohibit consideration of trapped-in capital gains taxes in all instances.[70] Instead, the court stated that

> we believe . . . that while discounts for built-in capital gains are not generally appropriate in dissenters' rights appraisal cases where no liquidation of the corporation is contemplated, such discounts might be appropriate, at the corporate level, if the business of the company is such that appreciated property is scheduled to be sold in the foreseeable future, in the normal course of business.[71]

The First Circuit Court of Appeals,[72] several New York appellate courts,[73] and the Colorado Court of Appeals[74] have applied similar reasoning.

---

[70] 51 P.3d 159, 169 (Wash. Ct. App. 2002).

[71] *Id.* at 168. The Dissenters' interpret the court's use of the word "scheduled" to mean that an appreciated asset must be subject to a contract to sell before any built-in capital gain tax can be deducted in determining fair value. But this interpretation conflicts with the court's focus on whether an asset is merely "contemplated" to be sold in "the foreseeable future, in the normal course of business." *Id.* Moreover, later in the opinion, the court clarifies by stating, "we believe that facts that were known or could be ascertained as of the date of the merger that relate to disposition of a particular appreciated asset—*such as contemplation of sale of the asset in accord with pre-existing planning in the normal course of business*—are properly considered in determining net asset value." *Id.* at 169 (emphasis added).

[72] *Bogosian v. Woloohojian*, 158 F.3d 1, 7 (1st Cir. 1998) ("The valuation of [the company] must include the expected tax liability that will be incurred on the three specifically planned sales and transfers and [the dissenting shareholder] will effectively shoulder

(continued)

¶52 And although we have never expressly addressed whether deducting capital gains taxes is permissible, our caselaw supports doing so in certain contexts. As we explained in *Oakridge Energy, Inc.*, "dissenting shareholders are entitled to receive the value of their holdings unaffected by the corporate action."[75] That basic principle suggests that it would be appropriate to deduct trapped-in capital gains taxes in this case because URI's plan to sell its St. George real estate was implemented long before the triggering transaction. In fact, calculating fair value without considering the trapped-in capital gains taxes would give the Dissenters a windfall because had the triggering transaction never occurred, URI still would have sold its St. George real estate and paid the accompanying capital gains tax,

---

one-third of the reduction. Any other decision would falsely inflate the value of [the company]."). The Dissenters attempt to distinguish this case on the basis that it was a dissolution case and is therefore inapposite. But the fact that the case was originated by a petition for dissolution is immaterial because the corporation later decided to purchase the minority shareholder's shares, which triggered a fair value appraisal. *Id.* at 3.

[73] *Murphy v. U.S. Dredging Corp.*, 903 N.Y.S.2d 434, 437 (App. Div. 2010); *Wechsler v. Wechsler*, 866 N.Y.S.2d 120, 122–29 (App. Div. 2008). Here again, the Dissenters attempt to distinguish *Murphy* by noting that it was a dissolution case. But in that case, as in *Bogosian*, the corporation elected to buy out the minority shareholders, which triggered a fair value appraisal. *See Murphy*, 903 N.Y.S.2d at 436.

[74] *Walter S. Cheesman Realty Co. v. Moore*, 770 P.2d 1308, 1312 (Colo. App. 1988). The Dissenters contend that this case is inapplicable here because in *Walter S. Cheesman Realty Co.* the capital gains taxes were "already owed as of the valuation date." Although true, this fact made no difference in the court's reasoning. The court noted that "the tax liability in question arose from the corporation's sale of its securities at a time unconnected with the corporate dissolution." *Id.* In other words, the assets were sold in the ordinary course of business. The court's opinion does not focus on whether the capital gains tax was incurred before or after the triggering event, but instead on whether the tax was "unconnected" to the triggering event. *Id.* This reasoning is equally applicable here given that the sale of URI's real estate was contemplated long before the share-consolidation transaction.

[75] 937 P.2d at 134.

which would have necessarily affected the value of the Dissenters' shares.

¶53 Moreover, it is a generally accepted, proper financial technique to consider trapped-in capital gains taxes in appraising the value of an asset that is to be sold. All three expert appraisers deducted the taxes in their assessments. Mr. Smith, the court-appointed appraiser, removed the deduction only after the district court sustained an objection by the Dissenters. The fact that three different financial appraisers all used the deduction in valuing URI suggests that it is a generally accepted, proper financial technique.

¶54 Finally, we note that the district court erred in requiring that an asset sale must be "imminent" before the tax consequences of the sale can be an appropriate consideration in determining fair value. The district court applied an imminence standard based on its reading of *Brown v. Arp & Hammond Hardware Co.*, a Wyoming Supreme Court case. But *Brown* itself does not require that an asset sale be imminent in order for a court to appropriately consider trapped-in capital gains. Rather, as noted above, *Brown* merely disallowed use of a trapped-in capital gains deduction where the discount "was premised upon action contemplated by the corporation subsequent to (or because of) the reverse stock split."[76] The court neither discussed nor applied an imminence standard and the only reference to it comes in a long quotation from a law review article.

¶55 An asset sale need not be imminent in order to consider the sale in calculating fair value. Instead, courts have allowed consideration of an asset sale "if the business of the company is such that appreciated property is scheduled to be sold in the foreseeable future, in the normal course of business."[77] Moreover, as URI points out, an imminence standard would be especially unworkable because "nearly all business valuations rely on assumptions about sales of assets, goods, or services that might occur years in the

---

[76] 141 P.3d at 689.

[77] *Smyth*, 51 P.3d at 168; *see Perlman v. Permonite Mfg. Co.*, 568 F. Supp. 222, 232, 232 n.3 (N.D. Ind. 1983) (holding that consideration of built-in capital gains taxes resulting from the sale of assets was not appropriate in that case because the corporation was not planning to liquidate, but noting that consideration of such taxes would be appropriate where "property was for sale at the time of the [triggering event] and was eventually sold").

future" and adoption of an imminence rule "would effectively eliminate tax considerations" from the fair value calculation entirely.

¶56 The district court's additional basis for rejecting the trapped-in capital gains tax deduction is also flawed. The court reasoned that "it is improper to deduct capital gains tax liability in determining the fair value of the dissenters' shares where the dissenters have already or will pay capital gains taxes on the appreciation of their shares." For this proposition, the district court cited the Washington Court of Appeals' decision in *Smyth*. But *Smyth* is inapplicable on this point because there the company had "converted to Subchapter S status thereby avoiding the double taxation problems of C corporations."[78] That is not the case here. On the valuation date, URI was a subchapter C corporation and so was subject to taxation at the corporate level.[79] The Dissenters would not be able to avoid double taxation in any event.

¶57 Deductions for trapped-in capital gains are appropriate where the taxes are reasonably foreseeable in the ordinary course of business. In this case, URI implemented a plan to sell appreciated real estate long before the triggering transaction took place. Accordingly, we hold that the district court erred in rejecting the tax deductions.

### C. *The District Court Erred in Rejecting Tax Deductions on URI's Oil and Gas Royalty Interests*

¶58 The district court erred in rejecting a deduction for income taxes on URI's oil and gas royalty interests. The court rejected the tax deduction because the "tax deductions applied in this case are improper as a matter of law." For that proposition, the court relied on the same cases from other jurisdictions that it relied on in prohibiting the discount for transaction costs and deduction for trapped-in capital gains. As an alternative basis for rejecting the deduction, the court concluded that the deduction was "speculative."

---

[78] 51 P.3d at 169.

[79] The Dissenters repeatedly suggest that URI could convert to a subchapter S corporation. But the Dissenters have not shown that this is in fact true given that federal law prohibits a corporation from electing S corporation status if the corporation has "as a shareholder a person . . . who is not an individual." 26 U.S.C. § 1361(b)(1)(B). And as of the valuation date, URI had nonindividual shareholders, including one of the Dissenters, MTC.

¶59 In Mr. Smith's initial valuation, he valued URI's oil and gas royalty interests using an income approach. As he explained in his report,

> [t]he Income Approach estimates the Fair Value based on the cash generating ability of the Company. This approach quantifies the present value of the future economic benefits that Management expects to accrue to the Company. These benefits, or future cash flows, are discounted to the present at a rate of return that is commensurate with the Company's inherent risk and expected growth.

Such an approach has long been accepted by courts as an acceptable valuation method.[80]

¶60 Taxes were relevant to Mr. Smith's analysis in two respects. First, to estimate URI's future net cash flows, he estimated future revenues from the royalty interests and then deducted associated expenses and income taxes on those revenues.[81] Had Mr. Smith not factored in expected income taxes, URI's future cash flows would have been significantly overstated.

¶61 The last step of the income approach required Mr. Smith to apply a discount rate to URI's future cash flows. This is the second instance where URI's marginal tax rate was relevant in his analysis. A common method for determining the applicable discount rate is to use the Capital Asset Pricing Model.[82] And one component of that

---

[80] *See Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1129 (D. Nev. 1998) (describing the discounted cash flow method as "generally accepted by courts faced with valuation cases"); *Cede & Co. v. Technicolor, Inc.*, Civ. A. No. 7129, 1990 WL 161084, *7 (Del. Ch. Oct. 19, 1990) ("In many situations, the discounted cash flow technique is in theory the single best technique to estimate the value of an economic asset.").

[81] *See Steiner Corp.*, 5 F. Supp. 2d at 1131 ("[T]he correct cash flow figure to discount should be calculated on an after-tax, debt-free basis.").

[82] *See id.* at 1132–33 ("Probably the most accepted way to calculate the discount rate, at least for discounting cash flows, is the Capital Asset Pricing Model . . . ."); *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 492 (Del. Ch. 1991) (noting that the Delaware Court of Chancery "has affirmed the general validity of [the Capital Asset

(continued)

model requires calculation of a company's weighted average cost of capital (WACC). Described simply, WACC is "the cost of equity times the percentage of equity in the capital structure plus the cost of debt times that percentage of debt."[83] The cost-of-debt component of WACC requires an appraiser to determine the after-tax rate of return on debt capital, which necessarily requires consideration of the applicable tax rate. To correctly calculate URI's cost of debt, Mr. Smith had to factor in URI's marginal tax rate; otherwise, the calculation would have been incorrect.

¶62 In sum, not only is it appropriate to consider tax rates in conducting an income approach valuation, it is necessary. The mathematical calculations used by finance professionals cannot be properly performed without consideration of taxes. Mr. Smith recognized this fact in his testimony, as illustrated by the following colloquy on cross-examination between Mr. Smith and Mr. White, URI's attorney:

> Mr. White: Well, shouldn't you have used a different discount rate when you are trying to capitalize pretax income stream?...
>
> Mr. Smith: I think the way I did it, originally, was where I took out taxes and the discount rate I used was an after-tax rate, and so I think if you just adjust it for the tax, that essentially is going contradictory to the ruling, so I stuck with the same discount rate.
>
> Mr. White: Okay. I understand how you got –
>
> Mr. Smith: You get the same value –
>
> Mr. White: Well, you don't exactly, because in the real world are there different discount rates that are applied to pretax cash flows as opposed to post tax cash flows?
>
> Mr. Smith: In theory you should get the same answer whether you're using a pretax discount rate or a post tax discount rate.

---

Pricing Model] approach for estimating the cost of capital component in the discounted cash flow model").

[83] *Cede & Co. v. JRC Acquisition Corp.*, Civ. A. No. 18648-NC, 2004 WL 286963, *7 (Del. Ch. Feb. 10, 2004) (internal quotation marks omitted).

Mr. White: I thought discount rates for pretax had to be higher, simply because they were pretax.

Mr. Smith: Right. Correct.

Mr. White: Well, since this was a pretax revenue stream in your amended report –

Mr. Smith: Uh-huh (affirmative).

Mr. White: -- shouldn't you have figured 13 percent, a little higher?

Mr. Smith: Well, I think that – again, I mean, if you're talking strictly valuation theory, I would agree with you. If you're talking about fair value standard and the Court's rulings, I can't speak to that.

¶63 In essence, in Mr. Smith's amended appraisal, he applied an erroneous income approach because he was obligated to follow the district court's instructions to not consider any taxes. As his testimony suggests, this is simply the wrong way to perform income valuation. Mr. Smith should have either applied a post-tax discount rate to the post-tax revenue stream (as he did in his initial valuation), or applied a pre-tax discount rate to pre-tax revenue numbers. The district court required that he do neither and instead had him apply a post-tax discount rate to a pre-tax revenue stream. This is an improper financial technique under any standard.

¶64 The cases relied on by the district court are not to the contrary. As previously noted, those cases rejected consideration of trapped-in capital gains taxes where a company had no plans of selling its assets before the triggering event.[84] But those cases do not support application of a blanket rule that taxes can never be considered in performing an income approach valuation.

¶65 The district court's alternative basis for rejecting the tax deductions is also unpersuasive. The court concluded that the deduction was speculative because "URI never paid 37.3 percent in taxes in the five years before the valuation date." This reasoning is flawed in two aspects. First, it overlooks the fact that a company may ultimately have no tax liability even if it engages in individual transactions that are subject to tax. For instance, the company may have offsetting credits that net out taxes incurred in other

---

[84] *Supra* ¶ 50.

transactions.[85] Second, URI points out that its "tax history [is] misleading because [the company] had heavy operating losses and thus low or no taxable profits." In fact, the company's prior financial difficulties led it to adopt the business strategy of selling its real estate holdings. In valuing the company, the appraisers made the reasonable assumption that over the course of ten years the company would successfully sell its real estate. And the appraisers explained in their testimony that it is standard valuation practice to use marginal tax rates in valuing a company, not historical tax rates.

¶66 In sum, the district court erred by overriding Mr. Smith's use of the generally-accepted discounted cash flow model, a model which necessarily requires consideration of marginal tax rates, and by holding that consideration of taxes was improper as a matter of law.

### D. The District Court Erred in Rejecting Application of a Minority-Interest Discount on URI's Interest in HHA

¶67 On the valuation date, URI owned a minority interest in a separate company, HHA. URI's minority stake in HHA was properly accounted for as an asset on URI's books. Each of the appraisers discounted its value, however, because URI, as a minority shareholder, lacked control over HHA. The district court concluded that the discount was an impermissible marketability discount and required Mr. Smith, in his amended valuation, to remove the discount. We conclude that the court erred in construing the discount as an impermissible marketability discount.

¶68 The district court determined that the discount was impermissible under our decision in *Hogle*. Specifically, the court cited our reasoning in *Hogle* where we noted that "a majority of courts that have addressed the issue of minority discounts has held that discounts at the shareholder level are inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller."[86] Because dissenting shareholders are unwilling sellers, we concluded that courts "should not employ discounts in . . . valu[ing] . . . the Minority's shares of [the company]."[87]

---

[85] This case demonstrates the point. Mr. Smith testified that URI was able to reduce its tax liability for several years by using net operating loss carryforwards.

[86] 2002 UT 121, ¶ 45 (internal quotation marks omitted).

[87] *Id.* ¶ 46.

¶69 Although, the district court correctly recognized that courts should not employ a marketability discount with respect to a dissenter's interest, the court erroneously extended this principle to discounts on assets held by the company generally. The impermissible marketability discounts we referred to in *Hogle* were those minority discounts that apply at the shareholder level, not those that apply at an asset level. As we stated in *Hogle*, the reason we reject minority discounts is that "discounts at the shareholder level are inherently unfair to the minority shareholder."[88]

¶70 That is not the situation here. None of the appraisers discounted the Dissenters' interest in URI based on their minority position. Rather, the appraisers discounted an asset held by URI. URI's lack of control over HHA affected each URI shareholder, majority and minority, on a pro rata basis. The Dissenters were not uniquely affected by the discount and so the discount was not "inherently unfair."

**Conclusion**

¶71 We first hold that URI did not waive its right to appeal by partially paying the judgment against it. URI never fully satisfied the judgment and has expressly reserved its right to appeal throughout the proceedings. As to the merits of the case, we hold that the district court erred in its fair value determination. Specifically, the court erred in rejecting the challenged deductions by relying on inapplicable caselaw from other jurisdictions and by misconstruing the deductions as impermissible marketability deductions. Accordingly, we vacate the court's ruling and remand for proceedings consistent with this opinion.

---

[88] *Id.* ¶ 45 (internal quotation marks omitted).