2020 UT App 43

# THE UTAH COURT OF APPEALS

SCOTT ANDERSON TRUCKING INC.,
Appellee,
*v.*
NIELSON CONSTRUCTION,
Appellant.

Opinion
No. 20180274-CA
Filed March 19, 2020

Seventh District Court, Castle Dale Department
The Honorable Douglas B. Thomas
No. 160700026

Joseph C. Rust, Attorney for Appellant

Stevan R. Baxter, Michael D. Lichfield, and Chase
Ames, Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1  Nielson Construction (Buyer) appeals the district court's summary judgment in favor of Scott Anderson Trucking Inc. (Seller) on Seller's breach of contract claim. After Seller told Buyer that it would sell a product for $25 per ton and that it had 12,000 to 15,000 tons available, Buyer emailed Seller, saying that Buyer "will need 12000 tons of [the product] at 20% for the project [and] will pay [Seller] $25.00 a ton." Buyer contends that the district court erred in determining that Buyer and Seller had an enforceable contract, that Buyer had not repudiated the contract, and that the contract was not a requirements contract. We affirm.

BACKGROUND[1]

¶2      Buyer is a road builder that was hired to perform paving work on Gooseberry Road (the Gooseberry Project). For this project, Buyer required rotomill, which is recycled asphalt that can be combined with new asphalt for paving.

¶3      Seller is a trucking company that hauls and sometimes supplies construction materials like rotomill. Around the same time that Buyer needed rotomill for the Gooseberry Project, Seller had a pile of rotomill on its property that had been removed from Buyer's previous project site.

¶4      In 2013, Buyer's representative and paving manager, Bobby Peirce, spoke with Seller's principal, Scott Anderson, about acquiring rotomill for the Gooseberry Project (the First Conversation). During the First Conversation, Peirce asked Anderson if Seller was interested in selling Buyer the pile of rotomill. Peirce also asked how much rotomill was available. Anderson explained that Seller "had somewhere between 12,000 and 15,000 tons remaining in the pile" and that it would sell the rotomill to Buyer for $25 per ton. In response, Peirce said that he "would have to review that price . . . with [Buyer's] management."

¶5      In December 2013, Peirce and Anderson spoke again (the Second Conversation). During the Second Conversation, Peirce told Anderson that "the price of $25 a ton was acceptable to [Buyer]." On December 31, 2013, Peirce emailed Anderson (the Email), stating,

---

1. "When evaluating the propriety of summary judgment on cross-motions for summary judgment, we view the facts and any reasonable inferences to be drawn therefrom in the light most favorable to the losing party." *Flowell Elec. Ass'n v. Rhodes Pump, LLC*, 2015 UT 87, ¶ 8, 361 P.3d 91.

> Scott
>
> There is 60000 tons of Asphalt on the Gooseberry Project we will need 12000 tons of Rotomill at 20% for the project will pay you $25.00 a ton. If there is more than that we may back haul some to Huntington thanks Bob.

The Email did not contain any conditions on the purchase related to the quality of rotomill, and Peirce did not subsequently communicate to Seller any different terms.

¶6    Buyer knew the location of Seller's pile of rotomill, knew that it came from Buyer's previous project, and had ample opportunity to inspect it. Yet Buyer did not view the rotomill until, at the earliest, the spring of 2015—at least sixteen months after the Email.

¶7    On September 12, 2015, Buyer started laying asphalt on the Gooseberry Project using rotomill from another source. Around that time, Peirce called Anderson to state that Buyer was rejecting Seller's rotomill because it was "faded or bleached and it's got lumps in it." Peirce had viewed Seller's stockpile of rotomill from his car and used that inspection as the basis for Buyer's rejection. After Buyer rejected Seller's rotomill, there was no market for it in the area.

¶8    Seller then sued Buyer for breach of contract. Both sides moved for summary judgment. In its motion, Buyer contended that the alleged contract between Buyer and Seller was indefinite and "too vague to enforce" and that Buyer was entitled to judgment as a matter of law. Seller opposed Buyer's motion, arguing that the "amount of rotomill and purchase price of the rotomill are clear, definite, and enforceable contract terms." In arguing that summary judgment instead should be granted in its favor, Seller further asserted that the undisputed facts showed that Buyer "breached a clear, definite, and enforceable contract

for the sale of rotomill, damaging [Seller]" in the amount of $300,000. Buyer opposed Seller's motion by arguing, in part, that even if a contract existed, Buyer rightfully terminated the contract when Peirce rejected the rotomill.

¶9 The district court agreed with Seller. It first determined "as a matter of law that there was, in fact, a contract between the parties pursuant to which [Buyer] agreed to purchase 12,000 tons of rotomill from [Seller] at $25 per ton." The court next determined that the contract did not fail for indefiniteness because the contract "specifically states the quantity requested, the parties knew, at all relevant times, where the product was and where it came from, and [Buyer] agreed to pay $25 per ton for 12,000 tons." The court further ruled that the contract lacked conditions about the quality of Seller's rotomill and that Buyer had not included "any condition precedent . . . or reserved any conditions."

¶10 On the question of whether Buyer rightfully terminated the contract, the district court concluded that Buyer "took too long as a matter of law to repudiate the contract." The court reasoned that the Uniform Commercial Code, as adopted by Utah, required Buyer to "inspect the goods sooner than 16–18 months after agreeing to purchase the rotomill." It explained that Buyer's "first indication" to Seller in the spring of 2015 that Buyer was not "abiding by the terms of the contract" came too late, especially when Buyer "could have looked at the pile before and after the contract was formed but failed to do so." As a result, the court determined that Buyer "did not reject or repudiate the contract for rotomill within a reasonable time" and that any alleged rejection of rotomill by Buyer was "ineffective."

¶11 The court then ruled that Buyer's breach of contract was "evident on September 12, 2015 when it moved forward on the Gooseberry Project without the rotomill" from Seller. The court thus granted summary judgment to Seller. And because Buyer

was contractually obligated to pay a principal amount of $300,000 under the contract, the court awarded Seller $300,000, plus interest.

¶12    After the court announced its oral ruling but before it entered its written ruling, Buyer delivered a letter and a $300,000 check to Seller. Buyer's December 18, 2017 letter stated,

> Enclosed with this letter is a check made payable to [Seller] in the amount of $300,000, reflecting the amount of the principal sum found owing by [Buyer] to [Seller]. We are making this payment while awaiting a final judgment for the purpose of abating interest. *In making this partial payment,* [*Buyer*] *fully and completely reserves its right of appeal* and specifically relies on *Utah Res. Int'l Inc. v. Mark Techs. Corp.*, 2014 UT 59, ¶ 33, 342 P.3d 761. As soon as there is a final judgment, it is the intention of our client to pay whatever sum is found remaining owing by the court and to also remove the 12,000 tons of the [rotomill] in question. Once again, this will all be done to avoid any further monetary obligations to [Seller] during the pendency of the appeal we will file as soon as there is a final judgment entered by the court.

(Emphasis added.) Seller responded with a letter acknowledging that it understood that Buyer "desires to both satisfy any judgment entered against it and maintain its appeal rights." But Seller's letter warned Buyer that it could not do both: "[Buyer] may either satisfy the judgment in full, as it has represented it will, and waive its appeal rights pursuant to Utah law, or appeal." Seller cashed the check.

¶13    In a subsequent order, the district court ruled that Buyer's $300,000 payment "[was] properly applied first to the amount of prejudgment interest owing as of the date paid with the

remaining balance then applied to the principal." In so ruling, the court acknowledged the December 18, 2017 letter, in which Buyer "asserted that the payment was not a waiver of [its] appellate rights."[2]

¶14    The district court then entered its written judgment in favor of Seller. At that point, Buyer still owed $68,137.05. Buyer filed a notice of appeal.

¶15    Days later, on April 10, 2018, Buyer tendered $68,137.05 to Seller. In a letter, Buyer stated, "We tender that amount to avoid further interest running during the pendency of the appeal [Buyer] has now filed. In making such a partial payment, [Buyer] fully and completely reserves its right of appeal . . . ." Seller responded that "this acceptance of tender does not waive [Seller's] right . . . to object to the appeal." Seller eventually filed a satisfaction of judgment with the district court. Buyer did not object to that filing.

ISSUES AND STANDARDS OF REVIEW

¶16    On appeal, Buyer contends that the district court erred in granting summary judgment in favor of Seller on its breach of contract claim. Buyer raises several arguments in support. First, Buyer argues that no binding contract was created. Second, Buyer argues that to the extent a binding contract existed, it was mutually rescinded or properly repudiated by Buyer. Third, and in the alternative, Buyer argues that even if there was a binding contract, the district court erred in determining that Buyer agreed to purchase 12,000 tons of rotomill instead of only the amount actually required for the Gooseberry Project.

---

2. In a footnote of the written order, the district court observed that "[t]he issue of whether [Buyer's] right to appeal has been preserved is not properly before this court to decide."

¶17    Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "We review a district court's grant of summary judgment for correctness, giving no deference to its conclusions of law." *Flowell Elec. Ass'n v. Rhodes Pump, LLC*, 2015 UT 87, ¶ 8, 361 P.3d 91. "Whether a contract exists between parties is ordinarily a question of law, reviewed for correctness." *Cea v. Hoffman*, 2012 UT App 101, ¶ 9, 276 P.3d 1178.

ANALYSIS

I. Seller's Procedural Arguments

¶18    Before considering the merits of Buyer's challenge to the district court's judgment, we must first address Seller's contention that procedural hurdles preclude our consideration of the merits of Buyer's appeal. First, Seller contends that this appeal should be dismissed as moot. Second, Seller contends that because Buyer did not preserve certain issues, this court should not address them.

A.    Mootness

¶19    Seller first contends that because Buyer "fully satisfied" the district court's monetary judgment against it, Buyer "waived its right to appeal and its appeal should be dismissed as moot." Buyer responds that "in making and [tendering] payments, there was always a clear statement that the payments . . . [were made] only to avoid additional costs, but fully reserving the right of appeal." Buyer therefore asserts that this appeal should not be dismissed because Seller "knew the moment it received the $300,000 check that [Buyer] planned on appealing and was making the payment simply to avoid ongoing interest." We agree with Buyer.

¶20   The Utah Supreme Court addressed this issue in *Utah Resources International, Inc. v. Mark Technologies Corp.*, 2014 UT 59, 342 P.3d 761. There, the court stated the general rule that "if a judgment is voluntarily paid, which is accepted, and a judgment satisfied, the controversy has become moot and the right to appeal is waived." *Id.* ¶¶ 29, 31 (cleaned up). In other words, generally, "voluntary payment of a judgment waives one's right to appeal." *Id.* ¶ 33.

¶21   Yet the court recognized an exception to the rule. It clarified that "where a judgment debtor's intention of preserving his right to appeal is made to appear clearly on the record, he does not waive his right to appeal."[3] *Id.* (cleaned up). Applying this exception, the court concluded that the appeal in *Utah Resources* was not moot given that the appellant "expressly reserved its right to appeal." *Id.* ¶ 2. The appellant conveyed this intent by, for example, delivering payment with a letter stating that "it did not intend to waive its current appeal and that it was paying only to abate interest and reduce the threat of postjudgment enforcement proceedings."[4] *Id.* ¶ 23; *see also*

---

3. Seller appears to read this clarification as applying only to partially satisfied judgments and not to, as here, fully satisfied judgments. Though the facts of *Utah Resources* involved a partially satisfied judgment, we do not read its holding as so limited. *See Utah Res. Int'l, Inc. v. Mark Techs. Corp.*, 2014 UT 59, ¶¶ 29–33, 342 P.3d 761. After all, the supreme court took the opportunity to clarify the law on the issue only because the appellant, who had partially satisfied the judgment, expressed concern that it may waive its right to appeal by satisfying the judgment in full. *Id.* ¶ 28.

4. In *Utah Resources*, the supreme court observed that "a judgment creditor who accepts the benefits of a judgment shifts the burden of risk to the judgment debtor, because the risk of

(continued…)

*Gardiner v. Anderson*, 2018 UT App 167, ¶ 15 n.10, 436 P.3d 237 ("[A]lthough Tenant paid the fees, he did so under protest and is therefore not precluded from appealing the district court's order with respect to the propriety of those fees."); *Checketts v. Providence City*, 2018 UT App 48, ¶ 24 n.6, 420 P.3d 71 (noting that the appellants "paid the award 'under protest'" and explaining that "because [they] made their objection clear on the record, they did not waive their right to appeal the district court's award of attorney fees and costs by paying it in advance of [the appellate court's] decision").

¶22 We follow the exception in *Utah Resources* here. Because Buyer's "intention of preserving [its] right to appeal [was] made to appear clearly on the record," Buyer did not waive its right to appeal. *See Utah Res.*, 2014 UT 59, ¶ 33 (cleaned up). Similar to the appellant in *Utah Resources*, Buyer tendered payment to Seller with letters stating that the payments were for the purpose of "abating interest" and that "[i]n making such a partial payment, [Buyer] fully and completely reserves its right of appeal." Both letters became part of the record, and in one of the district court's orders, the court acknowledged Buyer's assertion that its "payment was not a waiver of [its] appellate rights." Buyer's express statements, made contemporaneously with its tender, evidenced Buyer's intent to preserve its right to appeal. As a result, Buyer did not waive its right to appeal by paying the

―――――――――――――――――――――――――

(…continued)

recovery now falls on the judgment debtor if the judgment is overturned on appeal." *Id.* ¶ 29 n.30. In arguing that this case is moot and that Seller would be "severely prejudice[d]" by allowing Buyer to satisfy the judgment *and* preserve its right to appeal, Seller largely downplays this benefit of having accepted Buyer's payments, as well as the value to Seller of having the money available for its own use during the pendency of the appeal.

judgment, and this appeal is not moot. *See id.* ¶ 25 (concluding that an appellant did not waive its rights to appeal when it voluntarily made a partial payment of a judgment and it "expressly reserved its right to appeal throughout the proceedings").

B.     Preservation

¶23    Next, we consider whether Buyer's arguments are preserved for review. "To preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12, 435 P.3d 255 (cleaned up). The preservation analysis does not "turn on the use of magic words or phrases," *In re Baby Girl T.*, 2012 UT 78, ¶ 38, 298 P.3d 1251, but the party must sufficiently raise the issue "to a level of consciousness before the trial court," *Josephson*, 2019 UT 6, ¶ 12 (cleaned up). "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Notwithstanding, a lower court's decision "to take up a question . . . conclusively overcomes any objection that the issue was not preserved for appeal because the issue has consciously been addressed by the court." *Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, ¶ 16, 416 P.3d 663 (cleaned up).

¶24    Seller contends that Buyer did not preserve the following arguments: (1) that no contract was formed, (2) that any contract was mutually rescinded by the parties, and (3) that the alleged agreement was a requirements contract. We conclude that the second issue was not preserved but that the first and third issues were.

### 1.     Contract Formation

¶25    The district court affirmatively took up and decided the question of contract formation. Although in its written memoranda Buyer had assumed the existence of a contract for purposes of summary judgment, the court raised the issue sua sponte. It began oral argument on the competing summary judgment motions by asking the parties to focus on whether there was a contract. After considering both parties' arguments on the issue, the court ruled that a contract was established. Because the court consciously addressed the issue, we conclude that the issue is preserved. *See id.*

### 2.     Mutual Rescission

¶26    Buyer did not argue the theory of mutual rescission to the district court in its summary judgment briefing. And unlike the issue of contract formation, the district court did not raise the issue sua sponte at the summary judgment hearing. Consequently, the issue was not presented to the district court in such a way that it had the opportunity to rule on it, and we will not consider it further. *See Josephson*, 2019 UT 6, ¶ 12; *Johnson*, 2017 UT 76, ¶ 15.

### 3.     Requirements Contract

¶27    On the issue of whether the alleged contract was a requirements contract, Buyer's summary judgment briefing sufficiently presented the issue to the district court in such a way that the court had an opportunity to rule on it. Generally, a "requirements contract" is "a contract in which a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 45 n.11, 258 P.3d 539 (cleaned up).

¶28    Though Buyer did not use the precise term "requirements contract," Buyer did argue on summary judgment that to the extent a contract existed, "it was clearly tied to the Gooseberry [P]roject" and that because the government reduced the "quantities of rotomill allowed" on the Gooseberry Project (to lower than 12,000 tons of asphalt), "there can be no contract for a quantity greater tha[n] that actually used on the job." Buyer also argued that the Email "expressly mentions the requirements of the Gooseberry Project" and that "the price and quantity terms of the Purported Contract were conditioned on the timing and needs of the Gooseberry Project." In response, Seller disputed that the Email "ma[de] any reference to the 'requirements'" of the project, and it disputed the suggestion that the sale had "contingencies related to the Gooseberry Project."

¶29    These arguments raised before the district court the issue of how much rotomill Buyer was required to buy under the contract. Because Buyer argued at summary judgment that the contract was for only the amount of rotomill used on the Gooseberry Project, it gave the court the opportunity to rule on whether the contract was a requirements contract. And the court necessarily rejected that argument when it ruled that the contract obligated Buyer to purchase 12,000 tons of rotomill. Under these circumstances, we conclude that Buyer adequately preserved the issue of whether the contract was a requirements contract.

¶30    Having resolved Seller's procedural arguments, we now turn to the merits of Buyer's issues properly presented for review.

## II. Buyer's Arguments on Appeal

¶31    We address three issues raised by Buyer in challenging the district court's judgment. First, Buyer contends that an enforceable contract did not exist. Second, Buyer contends that it properly repudiated the alleged contract in timely fashion. Third, Buyer contends in the alternative that even if there was a

binding contract, the contract was a requirements contract, limiting its liability to the amount of rotomill actually used on the Gooseberry Project.

¶32 An appellant's brief must "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). To satisfy this requirement, a "party must cite the legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196. Further, an appellant must address and show error in the basis for the district court's decision. *Miller v. West Valley City*, 2017 UT App 65, ¶ 20, 397 P.3d 761. "An appellant that fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion." *Adamson*, 2017 UT 2, ¶ 13.

¶33 We first conclude that Buyer has not satisfied its burden of establishing error in the district court's decision regarding the existence of the contract and Buyer's claimed repudiation. We then conclude that the district court did not err in determining that the contract here was not a requirements contract.

A. Existence of a Contract

¶34 Buyer contends that the district court erred in determining that Buyer and Seller had an enforceable contract as a matter of law. In particular, Buyer asserts that because "no specific quantities [of rotomill] were discussed" in the First Conversation and Second Conversation, Buyer's Email—that referenced the specific amount of 12,000 tons—constituted the first offer or a counteroffer, which Seller never responded to or accepted. Buyer thus concludes that "no contract came into existence."

¶35 Where, as here, a contract involves the sale of goods, the Uniform Commercial Code (UCC) provides the governing standards for contract formation. *See generally* Utah Code Ann. §§ 70A-2-101 to -807 (LexisNexis 2009). Indeed, Buyer acknowledged in its summary judgment briefing that "[t]he parties in this case seem to agree that the UCC applies."

¶36 The contract formation provisions of the UCC include section 2-204, which provides that a "contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *Id.* § 70A-2-204(1). Section 2-204 also provides that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *Id.* § 70A-2-204(3). Further, when an underlying agreement is established under section 2-204, section 2-207 may apply. *See Herm Hughes & Sons, Inc. v. Quintek*, 834 P.2d 582, 584 (Utah Ct. App. 1992). Under section 2-207, "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." Utah Code Ann. § 70A-2-207(1).

¶37 In challenging the court's decision, Buyer maintains that because the Email referenced the specific amount of 12,000 tons, the Email was either (1) the "first offer" or (2) a counteroffer. But Buyer has not carried its burden of persuasion on either theory.

¶38 We reach this conclusion on Buyer's first argument because its opening and reply briefs do not address the contract formation provisions of the UCC even though Seller consistently presented UCC-specific arguments both before the district court

and this court. Buyer's second argument that the Email was merely a counteroffer similarly relies exclusively on common law rules without consideration of the relevant UCC provisions.

¶39 Simply put, Buyer has not grappled with the UCC's governing standards on contract formation and has not provided reasoned analysis based on relevant legal authority. *See Adamson*, 2017 UT 2, ¶ 13. By overlooking the UCC and citing only caselaw on the formation of contracts generally, Buyer does not explain how the UCC's standards apply to the facts of this case. Buyer thus has not developed an argument sufficient to carry its burden of persuasion, and we cannot say that the district court erred in determining that Buyer and Seller had an enforceable contract as a matter of law.

B. Repudiation

¶40 Buyer next argues that to the extent a binding contract existed, Buyer properly repudiated it. We again conclude that Buyer has not met its burden of persuasion.

¶41 In determining that Buyer's repudiation theory failed as a matter of law, the district court reasoned that Buyer "had an obligation under the Uniform Commercial Code as adopted by Utah to inspect the goods sooner than 16–18 months after agreeing to purchase the rotomill" and that Buyer "could have looked at the pile [of rotomill] before and after the contract was formed but failed to do so." Given that it took at least sixteen months after the contract was formed for Buyer to indicate that it would not abide by the contract, the court determined that Buyer "took too long as a matter of law to repudiate the contract."

¶42 Under the UCC, "[r]ejection of goods must be *within a reasonable time* after their delivery or tender" and rejection "is ineffective unless the buyer seasonably notifies the seller." Utah Code Ann. § 70A-2-602(1) (LexisNexis 2009) (emphasis added). And "[w]here a tender has been accepted, . . . the buyer must

*within a reasonable time* after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Id.* § 70A-2-607(3)(a) (emphasis added).

¶43   On appeal, Buyer does not devote adequate attention to the issue of the timeliness of its rejection. It instead focuses its briefing on showing that it had good cause to terminate the contract. And although it cites legal authority on the question of good cause, Buyer does not cite any authority on the issue of whether its rejection was timely. Nor does Buyer show that any particular authority on timeliness should apply to the facts of this case. As a result, Buyer has not demonstrated error in the district court's reasoning and has not met its burden to show error in the court's decision. *See Adamson*, 2017 UT 2, ¶ 13; *Miller*, 2017 UT App 65, ¶ 20.

C.     Type of Contract

¶44   Buyer alternatively argues that even if there was a binding contract, the district court erred in determining that the contract was for 12,000 tons of rotomill. According to Buyer, the contract was, at most, a "requirements contract." In so arguing, Buyer claims that because the Email "used conditional phrasing" and "identif[ied] the expected quantity of asphalt and the expected percentage of [rotomill] to asphalt," the "contract amount is limited to that which was used on the [Gooseberry] Project." Buyer concludes that the court therefore should have limited Seller's judgment to that amount, "namely, 6,825 tons." We disagree.

¶45   A "requirements contract" is generally defined as "'[a] contract in which a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period.'" *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 45 n.11, 258 P.3d 539 (quoting *Requirements Contract*, Black's

Law Dictionary (8th ed. 2004));[5] *see also* Utah Code Ann. § 70A-2-306(1) (LexisNexis 2009) ("A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.").

¶46    Like the district court, we do not read the Email as Buyer promising to buy only the rotomill that it actually required for the Gooseberry Project. The Email to Seller stated,

> There is 60000 tons of Asphalt on the Gooseberry Project *we will need 12000 tons of Rotomill* at 20% for the project will pay you $25.00 a ton. If there is more than that we may back haul some to Huntington thanks Bob.

(Emphasis added.) Even though Seller understood from the Email that Buyer would use 12,000 tons of rotomill on the Gooseberry Project and the Email contained the formula for Buyer's calculation, the Email's plain language did not communicate that Buyer was agreeing to purchase only that quantity of rotomill that it would ultimately need for the Gooseberry Project. Rather, it stated that Buyer "will need 12000 tons of Rotomill," thereby establishing 12,000 tons as the set quantity of rotomill. The Email suggested that "if there is more than [12,000 tons, Buyer] may back haul some" rotomill. But it did not ask for something less than 12,000 tons in the event that less rotomill was actually required for the Gooseberry Project.

---

5. The definition is the same in the 11th edition. *Requirements Contract*, Black's Law Dictionary (11th ed. 2019).

We therefore reject Buyer's argument that the contract was a requirements contract.

CONCLUSION

¶47    We first conclude that this appeal is not moot and that Buyer's mutual rescission argument is unpreserved. On the preserved issues, we conclude that Buyer has not established error in the district court's determinations that Buyer and Seller had a binding contract and that Buyer took too long as a matter of law to repudiate the contract. Finally, we conclude that the district court did not err in determining that the contract was not a requirements contract. Accordingly, we affirm.

―――――――